# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TERRI ANNE LEMON,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

12cv1004
ELECTRONICALLY FILED

## MEMORANDUM OPINION

**I.    Introduction**

Plaintiff Terri Anne Lemon ("Lemon") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f]. The matter is presently before the Court on Cross-Motions for Summary Judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56. Doc. Nos. 8 and 10. For the reasons that follow, the Commissioner's Motion for Summary Judgment (doc. no. 8) will be granted, and Lemon's Motion for Summary Judgment (doc. no. 10) will be denied.

**II.    Procedural History**

Lemon protectively applied for DIB and SSI benefits on August 21, 2007, alleging primarily ,"C-spine post-laminectomy syndrome with chronic radiculopathy, C7" and secondarily, "Mood Disorders[,]" but the Pennsylvania's Bureau of Disability Determination ("Bureau") denied the applications on December 6, 2007. R. 54-55. Lemon next applied for DIB and SSI benefits on March 4, 2009, alleging primarily, "Status Post Anterior Cervical

Fusion" and secondarily, "Major Depressive Disorder" claiming disability beginning on August 30, 1997, but the Bureau denied these applications on June 15, 2009. R. 57-58.

Lemon responded on June 30, 2009, by requesting an administrative hearing. R. 81-82. On August 4, 2009, a hearing was held in Mars, Pennsylvania, before Administrative Law Judge ("ALJ") John J. Porter. R. 32-53. Lemon, who was represented by Daniel Rucker, a non-attorney representative, appeared and testified at the hearing. R. 37-49, 50-51. George J. Starosta ("Starosta"), an impartial vocational expert, also testified at the hearing. R. 49-53. In a decision dated September 23, 2010, the ALJ determined that Lemon was not "disabled" within the meaning of the Social Security Act ("Act"). R. 11-24.

On October 4, 2010, Lemon sought administrative review of the ALJ's decision by filing a request for review with the Appeals Council. R. 7-10. The Appeals Council denied the request for review on May 23, 2012, thereby making the ALJ's decision the "final decision" of the Commissioner in this case. R. 1-6. Lemon commenced this action on July 18, 2012, seeking judicial review of the Commissioner's decision. ECF Nos. 1-2. The Commissioner and Lemon filed Cross-Motions for Summary Judgment on January 14, 2013, and January 15, 2013, respectively. Doc. Nos. 8 and 10, respectively. Those motions are the subject of this memorandum opinion.

### III. Standard of Review

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). A United States District Court may not undertake a *de novo* review of the

Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v.*

*Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court has summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in

4

making its decision. In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194

(1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

**IV.    The ALJ's Decision**

The ALJ concluded from all of the evidence that Lemon had not been under a disability within the meaning of the "Act". R. 14. In denying Lemon's March 4, 2009, request for benefits, the ALJ determined that Lemon: (1) met the insured status as required by the Act; (2) had not engaged in substantial, gainful activity since August 30, 1997; (3) had the following impairments: cervical and back disorders, sleep apnea, a history of diverticulitis, depression, anxiety disorder, and a history of drug and alcohol abuse; but (4) did not have an impairment (or combination of impairments) that met or equaled the criteria of any impairment in the listing of impairments. R. 16-17.

Explaining his decision with respect to Lemon's impairments, the ALJ noted that her "cervical impairment did not meet the requirements of listing 1.04." R. 17. The ALJ further noted that Lemon's back impairment did not meet the requirements of the listing. Id. He further

commented that her asthma and "sleep apnea has not caused clinical evidence of cor pulmonale with elevated mean pulmonary artery pressure or arterial hypoxemia." Id. The ALJ acknowledged that Lemon had "a history of diverticulitis with lap band surgery" but because the condition had not caused "obstruction, anemia, decreased albumin levels, abdominal mass, perineal disease, involuntary weight loss, or the need for enteral nutrition as required by listing 5.06[,]" he found the condition was not of "listing level severity." Id. The ALJ also noted that there was no listing for obesity, but commented that Lemon had a "significant reduction in weight, following lap band surgery . . . and has normal gait and station." Id. Finally, the ALJ found that upon consideration of Lemon's mental impairments (singly and in combination), those impairments did "not meet or medically equal the criteria of listings 12.04, 12.06, and 12.09. Id. In rendering this finding, the ALJ found that the "paragraph B" criteria were not satisfied. Id.

The ALJ explained that in order to satisfy the "paragraph B" criteria, Lemon's mental impairments, taken singly or in combination, had to "result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration." R. 17-18. He defined "marked limitation" as "more than moderate but less than extreme." R. 18. He defined "repeated episodes of decompensation" as "three episodes within one year, or an average of once every 4 months, each lasting for at least 2 weeks." Id. Insofar as Lemon's activities of daily living, the ALJ found that she was only mildly restricted. Id. The ALJ specifically noted that Lemon "activities of daily living are generally limited[,]" but that she remained "independent in personal care, clean her house taking breaks, wash and fold clothes[,] and cook." Id. With respect to

social functioning, the ALJ noted that Lemon had moderate difficulties, and based this finding on the fact that although she was suspicious of others, she could grocery shop, talk on the telephone, maintain her relationships with her boyfriend, family, friends, and neighbors. Id. With respect to concentration, persistence, or pace, the ALJ found that Lemon had moderate difficulties, and based this finding on Lemon's reports that she has poor concentration and task completion along with difficulty focusing. However the ALJ noted that Lemon was "able to care for her pets, perform chores around the house, pay bills, count change, handle a savings account and use a checkbook. Id. The ALJ also noted that Lemon only experienced no episodes of decompensation, and had "no history of extended inpatient hospitalization or partially hospitalized psychiatric care[,]" and "no ongoing suicidal or homicidal ideation." Id.

Thus, based on these findings, the ALJ concluded that the "paragraph B" criteria were not satisfied, and thus, Lemon did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR § 404, Subpart P, Appendix 1. R. 14-15. Id.

The ALJ found that Lemon had the residual functional capacity to perform work: (1) that involves lifting and carrying ten pounds occasionally and five pounds frequently; (2) sitting for four hours in and eight-hour workday; (3) standing or walking for four hours in an eight-hour workday; and (4) provided her with the option to sit or stand every thirty minutes. R. 19. In addition, the ALJ found that Lemon would be limited to simple, routine, repetitive work not performed in a fast-paced environment, with few workplace changes and only simple work related decisions and would be limited to only occasional interaction with supervisors and the public. R. 19.

With regard to Lemon's residual functional capacity, the ALJ considered all of Lemon's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based upon the requirements of 20 CFR §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p" as well as "opinion evidence in accordance with the requirements of 20 CFR §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." Id. In reaching the conclusion about Lemon's residual functional capacity, the ALJ first "determined whether there [was] an underlying medically determinable physical or mental impairment(s) – *i.e.,* an impairment(s) that can be shown by medically accepted clinical and diagnostic techniques – that could be reasonably expected to produce [Lemon's] pain or other symptoms." Id. The ALJ concluded, based on the medical evidence presented, that Lemon's medically determinable impairments could reasonably have caused her alleged symptoms. Id.

However, once the ALJ made this determination, he evaluated (as required) the intensity, persistence, and limiting effects of Lemon's symptoms to determine the extent to which they limited her ability to function. Id. In this regard, the ALJ found that Lemon's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not credible to the extent they [were] inconsistent with the . . . residual functional capacity assessment." Id. He further noted that based on Lemon's own testimony about her ability to manage the activities of daily living ("independent in personal care and is able to wash and fold clothes, wash some dishes, sweep the floor, dust[,] and prepare meals . . . go grocery shopping and . . . outside [for] two hours a day . . . maintain relationships with her boyfriend, family members, and friends . . . pay bills, handle a savings account, and use a checkbook . . . [go] to amusement parks, [do] things with her children"), the subjective factors were not entirely persuasive. R. 19-20. The

ALJ also found that Lemon's course of treatment had been "conservative and relatively effective in controlling her symptoms" and that she had performed some work in 2008 and 2009, "demonstrating her ability to perform the physical and mental demands of some work." R. at 20.

As for Lemon's credibility, the ALJ found that she undermined her own credibility by denying treatment for alcohol abuse, then testifying that she was a social drinker for several years and was treated for alcoholism fifteen years ago. Id. Then, at the end of her testimony she admitted she had received a DUI in 2008 and was "drinking heavy." Id. The ALJ noted that Lemon testified that she had "lost her commercial driver's license in 2008" because of this DUI. R. 21. In addition the ALJ noted that Dr. Uran, who performed a consultative evaluation in May of 2009, noted that Lemon was consuming alcohol once a week but not becoming intoxicated. Id. The medical records from Butler Memorial Hospital dated July of 2010 indicated that Lemon had engaged in heavy alcohol consumption. Id. The ALJ explained that discrepancies were "important because Advanced Pain Medicine was making an assessment as to the propriety of prescribing powerful narcotics." R. 20. The ALJ found that the discrepancies "undermine her credibility and posit a reason for pain complaints other than legitimate medical reasons." Id.

In addition to her lack of credibility, the ALJ also found that the medical evidence of record did not support Lemon's medical allegations in terms of physical complaints. Id. Although the ALJ acknowledged that Lemon had a cervical fracture in 2004, he noted that she reported improvement in the function use of her right upper limb following surgical fusion surgery. Id. In addition, he found that Lemon underwent a cervical epidural injection in July of 2010, and in August of 2010, she reported to the medical provider that the injection had helped her. Id. Likewise, although the ALJ noted that an MRI showed the cervical fusion surgery and mild diffuse annular bulges near the surgical site, there was no evidence of spinal stenosis and

the treatment was conservative – meaning pain medication, ice, and a TENS unit – all of which Lemon said helped relieve her pain. Id. Despite the fact that Lemon complained of right arm numbness, in July and August of 2010, Dr. Hornsby, her treating physician, found Lemon to be "neurologically intact." Id.

In addition to the cervical spine, Lemon complained of low back pain in her lumbar region. Id. Although a "radiological report . . . revealed minimal grade 1 spondylolisthesis . . . vertebrae appear intact and alignment was preserved." Id. In addition to these findings, the ALJ also noted that Lemon treated with a chiropractor in July of 2010, and reported that his treatment was "helping with her low back pain" and that she also received a lumbar epidural injection in August of 2010. R. 20-21.

Although Lemon suffered a mild case of diverticulitis in 2008, and was hospitalized for same, the ALJ noted that she improved with antibiotic treatment, no surgery was necessary, and that no further episodes of diverticulitis were noted in her medical record. R. 21. In addition, her medical records indicate that Lemon was "morbidly obese" and that she "underwent gastric band surgery without complication." Id. The ALJ noted that she used to weigh 249.8 pounds, but following the surgery and as of July and August of 2010, she weighed 198 pounds. Id.

Furthermore, although the ALJ acknowledged that Lemon had "a history of asthma, pulmonary function studies dated April 12, 2007[,] revealed only mild airflow obstruction and diffusing capacities were normal." Id. He further noted that when Lemon was seen in March of 2009 for shortness of breath, an X-ray showed that her lungs were clear with "no edema or pneumonia." Id. Finally, the ALJ found that Dr. Hornsby's July of 2010 treatment records indicated that Lemon had "no asthma complications . . . [and] was avoiding asthma triggers, was not smoking and was compliant with her medication regimen." Id. Although these same notes

indicated a prior diagnosis of obstructive sleep apnea, the notes also indicated that Lemon had a "good response with use of a CPAP machine." Id.

Finally, the ALJ noted that Lemon had a "two-day psychiatric hospitalization in August of 2007 for a self-inflicted knife wound, and was diagnosed with major depressive disorder without psychological features." Id. The ALJ further noted that Dr. Uran, who performed a consultative evaluation in November of 2007, found that although Lemon had a restricted mood and flat effect, her "thought process was normal and it was noted that [Lemon] never experienced hallucination." R. 22. Dr. Uran performed a second consultative evaluation in May of 2009, which revealed "symptoms of sadness, crying, isolation, apathy[,] and anxiety" but although Lemon appeared guarded, "there was no evidence of delusional thought process and her global assessment of function [GAF] was noted as 60." Id. In addition to Dr. Uran's records, Dr. Hornsby's July 2010 records also indicate, "problems with anxiety and depression[;]" however, he found that her "mood and affect were appropriate and she was interactive with normal social engagement and normal behavior." Id. He did note that she was treating with a psychologist on a weekly basis and was taking psychotropic medications. Id.

The ALJ found that there were no opinions from "her treating physicians indicating that [Lemon] is disabled or even has limitations greater than those determined in this decision." Id. To this end, the ALJ found that an opinion from Butler Physical Therapy concluded that Lemon demonstrated "the ability to work at a light physical demand level with restrictions for an eight-hour workday." Id. The ALJ specifically concluded that he gave this opinion "weight as it is consistent with the record as a whole, indicating that [Lemon's] course of treatment and generally unremarkable physical and neurological examinations." Id. The ALJ further noted that the state agency physician also concluded that Lemon could "perform light exertional work." Id.

11

Finally, the ALJ found that Dr. Uran concluded that in both November of 2007 and May of 2009, Lemon had no restriction "in understanding and carrying out simple instructions and no impairment in interacting appropriately with the public, supervisors or co-workers." Id. The ALJ stated that he accorded great weight to Dr. Uran's and to the state agency psychologist's opinions because they were well-supported by the medical evidence of record, consistent with the residual functional capacity the ALJ had outlined. R. 22-23.

Although the ALJ found that Lemon could not perform any past relevant work as an amusement park worker, caterer, print shop laborer, vendor, grocery laborer, aide, and warehouse worker, he found that there were jobs within the national economy that Lemon could perform. R. 23. The ALJ relying on the vocational expert's testimony found that given Lemon's age, education, work experience, and residual functional capacity, she could meet the "requirements of representative occupations such as surveillance system monitor, assemblers, and clerical sorter." R. 24. Based on the findings of the vocational expert, the ALJ concluded that Lemon was "not disabled." R. 24.

**V.     Discussion**

Lemon challenges the ALJ's decision by primarily attacking the ALJ's findings related to the vocational expert's testimony. Doc. No. 11. First, Lemon contends that relevant portions of the vocational expert's testimony were missing from the transcript; and second, she argues that even if the vocational expert's testimony was indicated as suggested by the ALJ's decision, the vocational expert's testimony fails to provide substantial evidence to support a denial of benefits. Id. at 9-10.

With respect to "missing" portions of the transcript, Lemon argues that the vocational expert, when given a hypothetical question which included a set of assumptions that

encompassed Lemon's restrictions, only responded that "[j]obs that would fit this set of assumptions include jobs such as a surveillance system monitor – [.]" Id. at 9, see also, R. 53. Lemon takes issue with the fact that the ALJ credited the vocational expert with stating that she could also work as a clerical sorter or assembler. Id. at 9.

Although the Court acknowledges that the transcript from the social security hearing concludes with the vocational expert's testimony seemingly being cut off as noted immediately above, the important fact is that at least one form of work (surveillance system monitor) was identified by the expert and recorded into the transcript. It is entirely possible that the vocational expert did identify "clerical sorter" and/or "assembler," but that the reporter failed to adequately record them, yet the ALJ may have recorded his own notes and drafted his opinion from those notes. Regardless of whether this actually occurred is of no moment, because at least one form of employment was identified by the expert and recorded by the court reporter, and it can form the basis for the pertinent portion of the ALJ's decision related to available work in the national economy which Lemon could perform.

Next, Lemon contends that "due to errors in weighing the medical opinion evidence and determining the [residual function capacity] RFC, the hypothetical question posed to the vocational expert was incomplete." Doc. No. 11, p. 10. However, Lemon fails to specifically highlight the alleged errors the ALJ made when "weighing the medical opinion evidence" which then rendered the hypothetical incomplete. This Court cannot assess such a broad-brushed contention.

Lemon also asserts that the hypothetical did not reflect all of her impairments, specifically, the limitations in "reaching or handling." Id., p. 10. Lemon contends that although the ALJ found that she retained residual functional capacity to perform "between sedentary and

13

light unskilled work[,]" his hypothetical question proffered "no limitations related to reaching and handling, despite substantial evidence of their existence." Id., pp. 11-12.[1]

In making this argument, Lemon relies on her own testimony, (*i.e.,* "Lemon reported dropping things and there was decreased sensation throughout the right hand and all fingers of the right hand"), which the ALJ properly evaluated and found to be not credible. The Court finds that the ALJ's opinion properly weighed Lemon's credibility and took care in explaining why he found her to be less credible specifically with respect to her complaints of physical pain and functioning. See R. 20-21. Furthermore, the Court also notes that the ALJ properly found that objective medical evidence weighed against Lemon's numbness assertions to the contrary (*i.e.,* in July and August of 2010, Dr. Hornsby, her treating physician, found Lemon to be "neurologically intact"). See R. 20.

In addition, Lemon relied upon two medical records in support of reaching and handling limitation contentions. Although the Court notes that Lemon cites page 255 of the Record as evidence of medical evidence concerning her arm radiculopathy, that page is a 2004 medical record from Allegheny General Hospital immediately following the fall which caused the fracture of her cervical spine. The ALJ noted that since that time, Lemon had spinal fusion due to the fracture, she had received epidural injections and after both procedures, she reported improvement. R. 20. Lemon also relies upon a 2010 medical report prepared by Hairong Peng where he notes "decreased sensation throughout the right hand all fingers of the right hand" (R. 689) in support of her contention. However, the ALJ considered Dr. Peng's findings, but noted that Lemon's treating physician, Dr. Hornsby, indicated that she was "neurologically intact" during her 2009 and 2010 examinations. R. 20.

---

[1] To the extent that the ALJ's failure to include restrictions concerning Lemon's reaching and handling constitutes Lemon's argument concerning "the [alleged] errors" made by the ALJ in "weighing the medical opinion evidence and determining the RFC," the Court addresses that issue herein.

As previously noted, when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [a claimant's] case record," the Commissioner will accord it "controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.967(c)(2). Even when an opinion provided by a treating source is not entitled to "controlling weight," it must still be considered for the purpose of determining whether the claimant's limitations would preclude the performance of substantial gainful activity. *Gonzalez v. Astrue*, 537 F.Supp.2d 644, 660 (D.Del. 2008). Where the record contains conflicting opinions submitted by different medical experts, the administrative law judge "is free to choose the medical opinion of one doctor over that of another." *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 505 (3d Cir. 2009).

Here, the Court does not find that the two medical records referenced by Lemon conflict with the medical evidence upon which the ALJ relied. Further, the ALJ provided adequate explanation and a thorough review of the medical evidence in support of his hypothetical question to the vocational expert. In short, the record supports the ALJ's hypothetical question posed to the vocational expert devoid of any consideration for "handling and reaching." Given the above, the Court also concludes that ALJ properly determined no accommodations were needed for Lemon's alleged manipulative limitations in the RFC. See Doc. No. 11, p. 12.

## VI. Conclusion

The Commissioner's "final decision" denying Lemon's applications for DIB and SSI benefits are "supported by substantial evidence" and will be affirmed. 42 U.S.C. § 405(g). Lemon's Motion for Summary Judgment (*ECF No. 10*) will be denied, and the Commissioner's Motion for Summary Judgment (*ECF No. 8*) will be granted. An appropriate order will follow.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel and Parties